*In re* MARRIAGE OF JOHN WAYNE SNOW, Petitioner and Counterrespondent-Appellee, and LUDENE C. SNOW, Respondent and Counterpetitioner-Appellant.

Fourth District   No. 4—95—0431

Opinion filed January 31, 1996.

644

Leo W. Quigg, Jr., of Fuller, Hopp, McCarthy & Quigg, of Decatur, for appellant.

Elmer C. Hawkins and Jeffery J. Hawkins, both of Brown, Hawkins, Basola & Mattingley, of Decatur, for appellee.

JUSTICE GREEN delivered the opinion of the court:

On April 28, 1995, the circuit court of Macon County entered a judgment of dissolution of marriage dissolving the marriage of petitioner John Wayne Snow and respondent Ludene C. Snow and resolving disputed issues concerning the distribution of marital property, maintenance, child support, and the payment of attorney fees. Respondent appeals, contending that the trial court abused its discretion in failing (1) to award her sufficient marital property and/or maintenance and child support to meet her reasonable needs and those of the parties' three children; and (2) to order petitioner to pay her attorney fees. We affirm in part, reverse in part and remand.

The parties were married in 1984; petitioner is approximately 50 years old, and respondent is approximately 39 years old. The parties have three minor children; the oldest child is 10 years old, and the twins are age 4. Respondent was awarded custody of the children by agreement of petitioner. Petitioner has a high school degree and since 1975 he has primarily worked in the insurance business as an agent for various brokers. Between jobs, the parties borrowed money from their respective families to purchase two businesses, the Paul Davis System and Chrysler Beauty Academy; both businesses were unsuccessful. For the last year and a half, petitioner had been the sole owner of an insurance agency known as Snow and Turner, Inc., d/b/a Market Place Insurance. Petitioner testified that the value of the insurance business was $25,000, although he acknowledged that insurance businesses which have been in existence for 5 to 10 years were normally valued at $1^1/_2$ times the gross income.

In 1994, petitioner's agency had $51,000 in gross commission income but had $80,000 in expenses. Presently petitioner earns between $4,000 and $4,500 a month in gross commissions. Petitioner projected that in 1995, the agency's commissions would increase 50%. In 1993, petitioner's gross income was $123,000. This consisted of a capital gain of approximately $117,000 in sale of Reliv International, Inc. (Reliv), stock, $725 in business income and $5,369 in interest income. Petitioner was also employed to sell stock to raise money for the formation of a computer company, and he believed he would earn $2,000 per month in that endeavor. Petitioner's financial affidavit indicated his monthly expenses were $2,235.

Respondent has a high school diploma and has received some cosmetology training. Prior to the parties' marriage, from 1979 until 1981, respondent worked as a cosmetology instructor at the Chrysler Beauty Academy. From 1981 until 1990, when the twins were born, she worked at the Chrysler Beauty Academy at the management level as a financial aid officer. Respondent continued to work as a

financial administrator at another cosmetology school until her position was eliminated in 1992. Since 1992, respondent has not worked outside the home. Presently respondent is attending Lincoln Land Community College to obtain a nursing degree. As a nurse, respondent will be able to earn approximately $15 to $20 per hour as compared to her salary as a financial aid officer of $5 to $6 per hour.

Respondent testified that she and the parties' children presently live in an apartment owned by her sister, and she lives on the money she receives from child support, public aid and money she has borrowed from her family. Respondent wanted to continue to attend school full-time in order to obtain a degree quicker.

During the marriage the parties lived in a home which petitioner had purchased prior to the marriage and was indisputably his nonmarital property. The parties paid a $25,000 mortgage on the home with marital funds. Respondent testified she invested $12,000 to $13,000 of her nonmarital funds in improving and finishing the house and that she personally did much of the finishing work herself. Petitioner acknowledged respondent's contributions to the house but claimed only $9,000 of respondent's nonmarital funds were used. The marital residence has a market value of between $50,000 and $90,000 and a home equity loan of $19,185. Petitioner also owned approximately 40 acres of farmland which were nonmarital property.

During the marriage, the parties purchased four rental properties, which were valued in total at $43,000 less a $10,519.51 debt, leaving $32,480 in equity. The parties also purchased approximately 10,550 shares of Reliv stock. Three thousand four hundred shares of Reliv stock remained valued at approximately $2 per share for a total value of $8,500. Those shares were restricted and could not be sold for two years. Petitioner admitted that within 60 days of the hearing he sold 7,150 shares of unrestricted Reliv stock for approximately $17,000. Petitioner did not give respondent any money from the sale, but claimed he used the funds to pay necessary expenses and child support. Petitioner submitted an exhibit listing the deposits from the sale of the Reliv stock and the expenses paid from those funds.

The parties owned $17,500 in personal property, including automobiles, boats, and household furnishings. The parties had several notes receivable totaling $9,636; however, petitioner testified that approximately $5,400 of that amount was not collectable. The parties had approximately $9,000 in cash remaining from the sale of the Reliv stock. These funds were kept in a checking account under the name "Snow Enterprises," which was used mainly in connection with the rental property. Each party had an individual retirement account (IRA), petitioner's was valued at $4,500 and respondent's was valued at $5,500.

The parties had a significant amount of debt accumulated during the marriage. The parties had credit card debt totaling $56,850, notes payable totaling $45,139, and bank loans totaling $23,185. The evidence established that $53,422 of credit card debt was accumulated by petitioner without respondent's knowledge, apparently used for business expenses and loans to petitioner's family and friends. Respondent used two credit cards on which she owed $3,428. Regarding the notes payable, $1,473 was borrowed from respondent's family for respondent's breast implants, $20,421 was borrowed from respondent's family to purchase Chrysler Beauty Academy, $5,371 was borrowed from respondent's family to purchase one of the rental properties, and $17,874 was borrowed from petitioner's family to purchase a partnership in Paul Davis Systems.

The court ordered respondent to pay child support in the amount of $125 per week and denied any award of maintenance. The court awarded petitioner the residence as his nonmarital property and directed him to pay respondent $4,500 for her "equitable interest therein." The court also awarded petitioner the farmland as his nonmarital property. The court divided the marital assets and debts as follows:

## PROPERTY AWARDED TO PETITIONER

Assets

| | |
|---|---|
| Rental real estate | $ 16,240 |
| 1,700 shares of Reliv | 4,250 |
| Snow and Turner Insurance | 25,000 |
| Notes receivable | 9,636 |
| Personal Property ordered sold and divided (boats) | 4,250 |
| Automobiles | 1,000 |
| Household furnishings | 7,622 |
| Cash—Snow Enterprises | 9,000 |
| IRA | 4,500 |
| | $ 81,498 |

Liabilities

| | |
|---|---|
| Bank Loans | $ 23,185 |
| Reimbursement for respondent's contribution to nonmarital residence | 4,500 |
| Credit cards | 53,422 |
| Notes payable (Paul Davis Systems) | 17,874 |
| | $ 98,981 |
| Net distribution | ( 17,483) |

## PROPERTY AWARDED RESPONDENT

### Assets

| | |
|---|---|
| Rental real estate | $ 16,240 |
| 1,700 Shares of Reliv | 4,250 |
| Automobiles | 8,000 |
| Personal property ordered sold and divided | 4,250 |
| Household furniture | 7,623 |
| Cash (reimbursement for contribution to petitioner's nonmarital residence) | 4,500 |
| IRA | 5,500 |
| | $ 50,363 |

### Liabilities

| | |
|---|---|
| Credit cards | $ 3,428 |
| Notes payable (breast implants, Chrysler Beauty Academy, rental property) | 27,265 |
| | $ 30,693 |

| | |
|---|---|
| Net distribution | $ 19,670 |

Initially, respondent contends the trial court abused its discretion in failing to award her more than $4,500 out of the marital estate for nonmarital and marital contributions made to petitioner's nonmarital residence. The evidence was uncontroverted that respondent contributed her nonmarital funds toward the completion of two additions to petitioner's nonmarital residence. These additions had been started prior to the time she moved into the residence. Petitioner testified respondent contributed $9,000 of nonmarital funds while respondent testified she contributed $12,000 or $13,000 of nonmarital funds. The evidence also established that both petitioner and respondent worked on remodeling the house and the parties paid the remaining mortgage of $25,000 with marital funds. The value of the house is unclear. Petitioner's financial statement prepared in 1994 indicated the house had a market value of $90,000 but petitioner testified that the house was in need of $17,000 to $19,000 in repairs. Petitioner testified he purchased the house for $50,000.

Apparently, the court viewed respondent's contribution of non-

marital funds to improve petitioner's nonmarital residence as marital funds. Using the $9,000 figure offered by petitioner, the court divided that amount equally as marital property. However, both petitioner and respondent testified that the funds in question were respondent's nonmarital property. The only dispute was how much nonmarital funds respondent contributed.

Section 503(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(c) (West 1992)), provides that when marital property and nonmarital property are commingled the contributing estate is transmuted to the classification of the estate receiving the contribution. However, the contributing estate can be reimbursed from the receiving estate unless the contribution "is not retraceable by clear and convincing evidence, or was a gift, or, in the case of a contribution of personal effort of a spouse to non-marital property, unless the effort is significant and results in substantial appreciation of the non-marital property." 750 ILCS 5/503(c)(2) (West 1992).

Here, applying section 503(c)(1) of the Act (750 ILCS 5/503(c)(1) (West 1992)), respondent's $9,000 was transmuted to petitioner's nonmarital property when it was invested into petitioner's nonmarital home. Although section 503(c)(1) of the Act refers to the commingling of marital and nonmarital property, we see no reason why that section should not apply when one spouse's nonmarital funds are contributed to the other spouse's nonmarital property resulting in a loss of identity of the contributing funds. Accordingly, pursuant to section 503(c)(2) of the Act, respondent is entitled to have her $9,000 reimbursed from petitioner's nonmarital estate if it is retraceable by clear and convincing evidence and not intended to be a gift.

■ At the hearing, there was no dispute that respondent contributed at least $9,000 of her nonmarital funds to petitioner's nonmarital home. Petitioner does not dispute that respondent did not intend to make a gift of those nonmarital funds to his nonmarital estate. Thus, respondent established a right to reimbursement from petitioner's nonmarital estate in the amount of nonmarital funds she contributed to that estate. On remand, the court will have to determine the amount of nonmarital funds respondent contributed.

■ Petitioner contends that respondent's contribution of nonmarital funds was apparently a gift to the marital estate, which in turn was transmuted to his nonmarital property. Thus, petitioner contends the court properly reimbursed the marital estate $9,000 for its contribution to his nonmarital estate and divided the funds equally between the parties. However, property acquired before the marriage is considered nonmarital property and as such would overcome any presumption of a gift to the marital estate. (750 ILCS

5/503(a)(6), (b) (West 1992).) Furthermore, there was no evidence that respondent's nonmarital funds commingled with the marital estate, as opposed to petitioner's nonmarital estate, transmuting those funds into marital property.

We do not deem the court's failure to reimburse the marital estate for marital contributions made to petitioner's nonmarital residence, such as respondent's efforts in remodeling, any alleged appreciation and payment of $25,000 mortgage payment, as an abuse of discretion.

■ The evidence established that both parties contributed personal effort in the remodeling of petitioner's residence. There was no clear evidence of the value of the appreciation, if any, due to respondent's personal efforts. Section 503(c)(2) of the Act requires "significant" personal effort by a spouse resulting in "substantial appreciation of the non-marital property" to establish a right to reimbursement. (750 ILCS 5/503(c)(2) (West 1992).) Thus, the trial court properly denied reimbursement to the marital estate from petitioner's nonmarital estate for respondent's personal efforts in remodeling petitioner's nonmarital residence.

■ Additionally, although the marital estate contributed $25,000 to petitioner's nonmarital estate through the payment of the mortgage on petitioner's nonmarital residence, there was no evidence how much of the contribution went to principal payments and how much went to interest payments. Generally, there is no right to reimbursement for interest payments. Furthermore, the marital estate would not be entitled to reimbursement for mortgage payments contributed to nonmarital property if the marital estate has already been compensated by the use of that property. (See *In re Marriage of Albrecht* (1994), 266 Ill. App. 3d 399, 401, 639 N.E.2d 953, 955.) Here, the parties lived in petitioner's nonmarital residence for at least 10 years during the marriage. Accordingly, because the parties benefited from living in the house for a substantial period of time, the court could reasonably have found that the marital estate had already been compensated for its contributions.

Next, respondent contends the court failed to divide the marital property in an equitable manner. Specifically, respondent maintains the court erred in awarding petitioner a greater share of the marital assets and failed to properly consider petitioner's sale of Reliv stock as a dissipation of marital assets.

The record demonstrates sufficiently that petitioner spent the $17,000 from the sale of Reliv stock on family expenses and marital expenses, including debt payment, for the trial court to find he did not dissipate marital funds. Petitioner presented an exhibit setting

forth his deposits made from the sale of Reliv stock and his expenses, including marital debt payments paid from those funds between November 1, 1994, and December 30, 1994. Based on this exhibit the court could have found that petitioner sustained his burden of proving that those expenditures were proper. No dissipation of marital funds occurs when a spouse spends those funds for legitimate family expenses and necessary expenses. *In re Marriage of Tietz* (1992), 238 Ill. App. 3d 965, 983, 605 N.E.2d 670, 683.

Petitioner, however, was awarded $9,000 which apparently was the remaining proceeds from the sale of the Reliv stock after paying all expenses. Petitioner was also awarded a greater share of assets than respondent. However, he was ordered to pay a greater portion of the marital debt, which included a large credit card debt associated with his insurance business. Considering the allocation of debt, respondent was awarded a greater net distribution of assets. We do not deem the division of marital assets to be an abuse of discretion, particularly in light of our decision that the trial court should have directed petitioner to pay respondent the entire amount of non-marital funds she contributed to his nonmarital house.

Respondent also contends the trial court erred in failing to either award her rehabilitative maintenance or reserve the issue of maintenance until a time when petitioner's financial position becomes more stable. While the record would support the trial court's denial of maintenance based on petitioner's present inability to pay, we agree with respondent that the trial court erred in not reserving the issue of maintenance for a later consideration of the parties' respective financial positions.

Presently, respondent is unemployed and enrolled full-time in nursing school. She lives on child support, public aid, and money borrowed from her family. Respondent testified that it would take approximately four years before she could be employed as a nurse. As a nurse, respondent stated she could earn between $15 to $20 per hour and she would be able to support herself and their three children. Respondent further testified that employment as a financial aid officer is difficult to find due to Federal cutbacks and she would earn $5 to $6 per hour. Although respondent has worked as a cosmetology instructor, she is not actually a cosmetologist. Respondent's net distribution of marital property is $19,670 plus any additional funds she will receive for her nonmarital contribution to petitioner's nonmarital property. However, out of the $50,363 of marital assets she received, $15,623 was the value of personal property and $5,500 was the value of an IRA.

Petitioner's present income from his insurance agency is unclear.

Petitioner's 1994 financial statement reflected that in 1994 he received $51,000 in gross commissions but had $80,000 in expenses. Nevertheless, petitioner testified that in 1995, he expected that his commissions would increase 50% and that he would receive an additional $2,000 per month for his efforts in selling certain stocks.

There is no indication that respondent was given property in lieu of a maintenance award. Petitioner was awarded $81,498 in assets. This amount included his insurance agency, valued at $25,000, which will provide him with income. Only $8,622 of those assets was comprised of personal property. Respondent was awarded $50,363 of assets and nearly $20,000 of those assets was comprised of personal property. Petitioner was given a substantial amount of debt which gave him a net negative distribution of $17,483. Most of that debt was related to his insurance agency and would not have to be paid off at one time. Furthermore, all of the parties' income-producing assets, other than petitioner's insurance agency and some of the parties' personal property, was divided equally between the parties. Thus, we do not believe the court would need to reconsider the property distribution when it later considers whether maintenance is warranted.

■ Section 401(b) of the Act (750 ILCS 5/401(b) (West 1992)) authorizes the court to reserve, among other things, the issue of maintenance. The Supreme Court of Illinois in *In re Marriage of Cohn* (1982), 93 Ill. 2d 190, 199, 443 N.E.2d 541, 545, discussed a number of appropriate circumstances for entering a bifurcated judgment of dissolution and reserving issues such as maintenance. Applicable here, the *Cohn* court noted that such an appropriate circumstance would be if the party ordered to pay maintenance would be unable to do so. Here, respondent has demonstrated some need for receiving rehabilitative maintenance and petitioner has demonstrated a present inability to pay. On remand, the trial court must set a certain time period to review the issue of maintenance.

■ Respondent maintains the court erred in awarding child support in the amount of only $125 per week. Petitioner's income is difficult to ascertain because his insurance business is new and he is operating with a lot of start-up costs. However, as already discussed, respondent projected that he would earn a 50% increase in commissions in 1995 and would be receiving an additional $2,000 per month for his stock sales. Section 505(a)(5) of the Act (750 ILCS 5/505(a)(5) (West 1992)) provides that if net income cannot be ascertained "the court shall order support in an amount considered reasonable in the particular case." At the present time, the trial court's child support order is reasonable.

■ Finally, respondent maintains the court erred in not directing

petitioner to pay her attorney fees, which amounted to $4,700. The decision to award or deny the payment of attorney fees is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. The party requesting the payment of attorney fees has the burden of demonstrating she is unable to pay and the other party has the ability to pay. (*In re Marriage of Werries* (1993), 247 Ill. App. 3d 639, 655, 616 N.E.2d 1379, 1392.) Considering petitioner's considerable debt and the additional obligation he will incur on remand, we do not consider the trial court's decision to deny respondent an award of attorney fees to be an abuse of discretion.

For the reasons stated, we affirm all portions of the decree on appeal except with regard to (1) the award to respondent in regard to her monetary contribution to petitioner's nonmarital residence property, and (2) respondent's request for maintenance. We reverse the rulings in those regards. We remand to the circuit court of Macon County. The circuit court shall then hear further evidence, if it deems it necessary to do so, in regard to the amount of respondent's monetary contribution to that residence property and require petitioner to reimburse respondent for that full sum from his nonmarital assets or assets awarded to him. The circuit court shall also rule that the issue of maintenance shall be reserved until a reasonable date.

Affirmed in part; reversed in part and remanded with directions.

COOK, P.J., and GARMAN, J., concur.