**NOTICE**
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210322-U

NO. 4-21-0322

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 15, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| CARLA GUIHER, | ) | Circuit Court of |
|     Petitioner-Appellee and | ) | Woodford County |
|     Cross-Appellant, | ) | No. 18D53 |
|     and | ) | |
| GARY THOMSEN, | ) | Honorable |
|     Respondent-Appellant and | ) | Michael L. Stroh, |
|     Cross-Appellee. | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Steigmann concurred in the judgment.

## ORDER

¶ 1     *Held*: The appellate court affirmed in part and reversed in part, holding the trial court did not abuse its discretion by denying respondent's motion to reconsider and reopen proofs, but the trial court's decisions finding respondent's nonmarital assets lost their identity when commingled with marital assets and then denying respondent reimbursement for nonmarital contributions to the marital estate stood against the manifest weight of the evidence; we remand for the trial court to evaluate petitioner's requests for maintenance and attorney fees in light of the altered property division.

¶ 2     Respondent, Gary Thomsen, appeals the trial court's judgment denying his posttrial motion to reconsider and reopen proofs, arguing he "should have been permitted to present actual documentation and evidence" regarding a disputed Edward Jones individual retirement account (IRA). Alternatively, he contends the trial court's judgment of dissolution erroneously denied him reimbursement for nonmarital contributions he made to the IRA. Petitioner, Carla Guiher, cross-appeals, arguing the trial court's judgment denying her requests

for maintenance and contribution toward attorney fees amounted to an abuse of discretion. We partially agree with Gary, holding the trial court erred in classifying the entire IRA as marital property because Gary's nonmarital contributions retained their identity. Alternatively, the trial court erred in denying Gary reimbursement for those contributions. We affirm in part and reverse in part and remand for further proceedings consistent with this order.

¶ 3                                  I. BACKGROUND

¶ 4              Gary and Carla married on December 9, 2006, in Johnson County, Kansas. Over the span of their marriage, the couple primarily resided in Kansas and Missouri, though they periodically resided in Woodford County, Illinois, in a home owned by Carla's family's trust. The couple separated in May 2017, and Gary remained in the marital residence in Lake Ozark, Missouri, while Carla remained in the Woodford County, Illinois, home. Carla filed a petition for dissolution of marriage on June 28, 2018. During the prolonged discovery period, the parties traded various filings, including multiple motions to compel, fought over custody of one of their three dogs, and disputed maintenance and attorney fees for Carla. In two separate agreed orders, the trial court ordered Gary to pay Carla maintenance totaling $1825.65 every two weeks and ordered Gary to pay $5000 toward Carla's attorney fees.

¶ 5              The matter eventually culminated in a one-day trial on June 22, 2020. Carla testified she was 67 years old. She recounted her marital, educational, and employment histories. During her marriage to Gary, she worked as a counselor and a teacher. She worked as a counselor in her own private practice (Counseling Clinic, Inc.) until 2010. She was an adjunct professor at Johnson County Community College in Overland Park, Kansas, from 2001 to 2010. Carla's last job was as a part-time substitute teacher at Metamora Grade School in Metamora, Illinois, from 2013 to 2017 (her highest earnings as a substitute teacher was $497/year). Carla

testified she was not currently looking for work, though she could substitute teach if she wanted when school resumed. She previously inquired about transitioning her volunteer work at Mended Hearts, an animal-assisted therapy program, into paid employment as a counselor, but she had not done it because she would have to recertify her license, pay 11 years' worth of dues, and complete 220 hours' continuing education.

¶ 6        Carla testified she was in good health, despite having scoliosis and asthma. She noted her conditions did not prevent her from caring for her two dogs. Carla testified she and Gary enjoyed a "very comfortable lifestyle" during the marriage. She noted they traveled only occasionally, but they "did a lot of dining out and movies, concerts. We really enjoyed going to concerts in Kansas City." Carla testified she had not been able to maintain that lifestyle since separating from Gary, stating, "I've just really scaled back on every aspect of what I've done ***." Carla specifically noted: "I don't travel much anymore. *** I don't eat out much. I certainly don't shop recreationally the way that I used to."

¶ 7        Carla testified to her monthly expenses and her need for maintenance from Gary since she had no other income. She testified she had already paid her attorney $21,000 in fees and still owed on the balance. Carla noted she had not applied for Social Security benefits because she planned to collect on her first husband's earnings, but she could not do that until her divorce from Gary was finalized. Carla did not say she would definitely apply for Social Security benefits, but her "intention is to certainly look into it."

¶ 8        Gary testified he was 68 years old and lived in the marital residence. He testified he was a doctor and recounted his work history. Gary noted he was currently employed as a telemedicine physician through Barton & Associates, averaging 15 hours per week and earning $80 per hour. He also received Social Security benefits. Gary testified that before Carla filed for

divorce, he had planned on retiring in fall 2020, but he had continued working because of the divorce. He estimated his total monthly income averaged $6666. He testified he paid Carla the court-ordered maintenance and paid $7800 of Carla's attorney fees.

¶ 9    Gary testified he opened an Edward Jones IRA during his marriage to Carla. He stated the Edward Jones account was made up of various retirement accounts he held before he married Carla in 2006. He presented Respondent's Exhibit D, which included statements detailing the following nonmarital accounts' values on December 31, 2006: Wachovia Securities IRA $344,090.23; Adventist Healthcare Retirement Plan (AHRP) 403(b) $69,180.84; AHRP 401(a) $40,792.95. Gary confirmed these three accounts "are *** part of what makes the corpus of the Edward Jones [IRA]." He testified he transferred the money in the Wachovia account to the Edward Jones IRA in 2011 and transferred the two AHRP accounts in March 2016. He estimated each AHRP account was valued between $150,000 and $200,000 when he rolled them into the Edward Jones IRA. Nevertheless, Gary requested only that the value of these nonmarital accounts as of December 31, 2006, ($454,064.02) be classified as nonmarital property or that he be reimbursed for those contributions.

¶ 10    Gary testified he borrowed $50,000 from his AHRP 403(b) account in 2011 as part of the down payment he put on the marital residence in Missouri. He stated he paid back the loan over a four- or five-year span using marital funds. He maintained he repaid the loan before merging the account into the Edward Jones IRA in March 2016. Though he could not recall exactly, Gary testified he used some funds from the Edward Jones IRA to purchase furniture and appliances following his separation from Carla. Likewise, Gary stated he used money from the Edward Jones IRA for living expenses when he was unemployed in 2019 and to pay Carla's maintenance from July 2019 through June 2020.

¶ 11   Upon the close of evidence, the trial court instructed the parties it wanted written closing arguments, though it gave them the option of also making oral arguments that day. Both parties waived oral closing arguments and agreed to submit written closing arguments in 14 days. Before adjourning, the court confirmed with counsel for both parties what exhibits they presented and asked to be admitted. Each attorney confirmed the court had the proper exhibits.

¶ 12   Each side submitted a timely written closing argument. As it pertains to issues on appeal, Carla argued the Edward Jones IRA should be divided equally because any nonmarital property Gary put in the account had become commingled with marital property, making the entire account marital property. She argued Gary failed to trace the nonmarital deposits by clear and convincing evidence. She argued she was entitled to at least half of the Edward Jones IRA ($957,350.16), plus an additional $113,102.66 for withdrawals Gary made from the account in 2019 and 2020.

¶ 13   Carla also argued she should be awarded maintenance given her diminished lifestyle and lack of income. Based on statutory guidelines, Carla calculated her maintenance should be $1847.17 per month for five and a half years, noting it was a decrease from the temporary maintenance award. Carla finally argued Gary should contribute to her attorney fees because she did not have the ability to pay while he did. As of the trial date, she had incurred fees totaling $45,640 and expected to incur at least $7000 more. She attributed most of those fees to discovery matters that required her to file three motions to compel. At the time of the closing argument, Carla still owed $26,990 in attorney fees.

¶ 14   Gary's closing argument reiterated much of his testimony as it relates to the issues on appeal. He valued the Edward Jones IRA as of the trial date at $980,000. Based on Respondent's Exhibit D and Gary's trial testimony, he argued $454,064 was nonmarital property

that he transferred into the account during the marriage. Taking out the nonmarital property would leave $525,936 in the account, and Gary argued each party should receive half of that amount ($262,968).

¶ 15 Gary made two arguments as to maintenance, one for past maintenance and one regarding future maintenance. He first argued for an abatement retroactive to July 2019, when his income decreased. He noted Carla had been choosing not to work or receive Social Security benefits. He maintained that he continued to pay Carla $1825.65 every two weeks when he should have only had to pay her $1155.42 per month. He requested a credit for $30,682.63. Gary next argued for the trial court to deny Carla's request for present and future maintenance. He noted Carla will be receiving a substantial sum of money in the property division. He further noted Carla is in good health and could work, but she chose not to work. Likewise, Carla chose not to receive Social Security benefits. For similar reasons, Gary argued against contribution for Carla's attorney fees.

¶ 16 On February 25, 2021, the trial court issued a written judgment of dissolution of marriage. As is relevant here, the trial court classified the entire Edward Jones IRA as marital property and denied Gary any reimbursement for nonmarital funds deposited into the account. The trial court found, "[t]here is no doubt that [Gary] possessed three accounts prior to the marriage which totaled $454,064" because "Respondent's exhibit D clearly demonstrates that." However, the court determined it could not "conclude that the [commingled] funds maintained their [nonmarital] identity." The court explained, "there [was] insufficient evidence detailing the exact amount transferred that can be appropriately traced," which left "the court to speculate as to the amount actually contributed to the Edward Jones Account." The court concluded the entire value of Edward Jones IRA was marital property and "shall be split evenly between the parties."

¶ 17 The trial court's order then addressed Carla's request for maintenance. It noted the governing statute (750 ILCS 5/504(a) (West 2018)) outlined 14 factors for consideration. The court addressed each one, though it made detailed findings on just a few factors. Concerning the parties' income, property, and financial obligations, the court made the following findings:

"[Carla], as a result of this order, is being apportioned in property, equity, and investment accounts a total of $623,675.08. She is currently unemployed but is eligible for social security benefits for which she has not yet applied. According to her testimony she plans to apply for such benefits at the conclusion of this case. [Carla] retains the home located [in] *** Metamora, Illinois, 61548. According to [her] financial affidavit, she does not have a mortgage to pay on the property which implies she owns the property free and clear. [Carla] is not responsible for the care of any other individual.

[Gary] is currently employed earning approximately $6,666 per month between employment and [Social Security benefits]. He has been awarded the marital home and the debts associated with it which include a mortgage payment of $1259 per month and taxes and insurance of $414 per month. He has been rewarded [*sic*] $478,675.08 in equity and investment accounts."

As for the needs of each party, the court concluded "neither party live[d] an extravagant lifestyle," "[n]either party *** suffer[s] from any harsh medical conditions requiring extra care and attention," and "[b]oth parties are physically able to care for themselves." Turning its

attention to the parties' earning capacity, the court noted the parties' ages (Carla 67 and Gary 69) and determined "[b]oth are well past the age to qualify for retirement benefits." The court noted Gary had hoped to retire soon. The court concluded their future earning potential would decrease and both "will become reliant upon their retirement and [Social Security benefits] as they increase in age." Concerning the couple's standard of living during the marriage, the court described it as a "modest but comfortable lifestyle that enabled them to travel, dine out, and maintain two homes." As for the duration of the marriage, the court noted the pair was married for 12 years. The court found the remaining statutory factors either did not apply or were covered by the above findings. The court ultimately concluded "that an award of maintenance [was] not appropriate," citing the parties' ages, impending retirements, sufficient resources, and their ability to care for themselves. The court also denied Gary's request for a retroactive downward deviation from prior maintenance payments.

¶ 18         The trial court next addressed Carla's request for contribution toward her attorney fees. It noted it must consider many of the same factors it did for the maintenance decision. The court found it relevant that Carla had been allocated $623,329.18 in assets while Gary received $478,675.08. Though Gary stilled worked and received Social Security benefits, he assumed all debt in the marital residence. Similarly, the trial court found it relevant that Carla did not work but planned to "look into" receiving Social Security benefits. The court noted Gary hoped to retire soon. The court acknowledged the divorce proceedings were "long lasting" but found they were "not complicated." The court noted the discrepancy in legal fees—$52,000 for Carla and $20,000 for Gary. It further noted Gary already contributed $5000 toward Carla's fees. Upon consideration of these factors, the court denied Carla's request for fees, "conclud[ing] that requiring [Carla] to pay her attorney fees would not exhaust her estate or strip her of her means

- 8 -

of support or undermine her economic stability." The court reiterated Carla had "adequate resources to cover the cost," noting she had "been awarded a substantial amount of money and is in possession of a house that is unencumbered by a mortgage."

¶ 19        On the same day the trial court entered its judgment, Gary's counsel moved for leave to withdraw from the case, and days later another attorney entered his appearance. The trial court eventually allowed Gary's first attorney to withdraw. On March 11, 2021, Carla filed a motion to correct, clarify, and reconsider the judgment. The motion highlighted several typographical errors and asked those be corrected. The motion requested clarification on valuation dates and dates payable, amongst other things. Finally, the motion asked the court to reconsider its decisions denying Carla maintenance and not ordering Gary repay the $113,102.66 he took from the Edward Jones IRA in 2019 and 2020.

¶ 20        Two weeks later, Gary countered by filing a motion to reconsider and reopen proofs. He attached to the motion several exhibits. Gary argued the entirety of the Edward Jones IRA should be his nonmarital property since it began with him rolling-over other nonmarital retirement accounts into that one IRA—and the new exhibits would confirm that argument. He argued these documents would remove any speculation as to the exact amount of nonmartial contributions to the Edward Jones IRA. Despite offering this additional evidence, Gary maintained he already proved the nonmarital accounts' existence and values through clear and convincing evidence, namely Respondent's Exhibit D. Gary noted he testified he closed those accounts and then transferred the funds into the Edward Jones IRA, and that testimony stood uncontroverted. Gary claimed everyone at the trial (his counsel, Carla's counsel, and the court) mistakenly concluded the Edward Jones IRA was marital property and that mistake should now be corrected. Contrary to his trial testimony and closing argument, Gary's postjudgment motion

maintained the entire Edward Jones IRA should be classified as nonmarital property and offered evidence to support his claim.

¶ 21　　　　On May 20, 2021, the trial court heard their respective motions. The trial court granted Carla's motion for correction and clarification but denied her motion to reconsider its conclusions as to maintenance and property division, "relying on its findings of 2/25/21." The trial court also denied Gary's motion for reconsideration and to reopen evidence. The court found the exhibits Gary offered "are not newly discovered evidence, as contemplated, which would justify a re-opening of the case." The court determined, "[t]he proposed evidence was available to [Gary] at the time of trial," and "[n]eglecting to present such evidence at the original trial is not reason enough to give [Gary] a [second] bite at the apple." The trial court issued an amended judgment addressing Carla's recommended corrections, but it did not alter any of its prior findings or conclusions.

¶ 22　　　　This appeal followed.

¶ 23　　　　　　　　　　　　II. ANALYSIS

¶ 24　　　　Gary challenges the trial court's decision denying his motion to reconsider and reopen proofs as an abuse of discretion. He further contends the court's determination that he was not entitled to reimbursement for nonmarital contributions he made to the Edward Jones IRA stands against the manifest weight of the evidence. Carla meanwhile argues the trial court abused its discretion in denying her requests for maintenance and contribution toward her attorney fees. For the reasons below, we affirm in part, reverse in part, and remand for further proceedings consistent with this order.

¶ 25　　　　　　　　A. Gary's Motion to Reconsider and Reopen Evidence

¶ 26　　　　　Gary argues the trial court abused its discretion in denying his combined motion to reconsider and/or reopen the evidence. Since Gary's motion addressed the motion to reopen first and then addressed the motion to reconsider, we take them in the same order.

¶ 27　　　　　　　　　　　　1. *Motion to Reopen Evidence*

¶ 28　　　　　"[T]he decision to reopen a case to allow for the introduction of additional evidence rests within the sound discretion of the trial court, and the trial court's decision will not be disturbed by a reviewing court absent an abuse of discretion." *Dunahee v. Chenoa Welding & Fabrication, Inc.*, 273 Ill. App. 3d 201, 210, 652 N.E.2d 438, 445 (1995). "An abuse of discretion occurs when 'the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *Lisk v. Lisk*, 2020 IL App (4th) 190364, ¶ 22, 143 N.E.3d 1240.

¶ 29　　　　　"The [four] factors to be considered in determining whether a party should be permitted to reopen proofs include (1) whether the failure to introduce the evidence occurred because of inadvertence or calculated risk, (2) whether the adverse party will be surprised or unfairly prejudiced by the new evidence, (3) whether the new evidence is of the utmost importance to the movant's case, and (4) whether any cogent reason exists to justify denying the request." *Stringer v. Packaging Corp. of America*, 351 Ill. App. 3d 1135, 1141, 815 N.E.2d 476, 482 (2004). "If evidence offered for the first time in a post-trial motion could have been produced at an earlier time, it is not an abuse of discretion for the court to deny its introduction into evidence." *In re Marriage of Davis*, 215 Ill. App. 3d 763, 776, 576 N.E.2d 44, 53 (1991); see also *Stringer*, 351 Ill. App. 3d at 1142 (stating the same principle). The rationale for that principle is finality. "This court has recognized that it is the parties' obligation to present evidence *** and has adopted the view that reviewing courts cannot continue to reverse and

remand dissolution cases where the parties have had an adequate opportunity to introduce evidence but have failed to do so." *In re Marriage of Holder*, 137 Ill. App. 3d 596, 603, 484 N.E.2d 485, 490-91 (1985). "Trial courts should not permit litigants to stand mute, lose a motion, and then frantically gather evidentiary material to show that the court erred in its ruling. Civil proceedings already suffer from far too many delays, and the interests of finality and efficiency *require* that the trial courts not consider such late-tendered evidentiary material, no matter what the contents thereof may be." (Emphasis in original.) *Gardner v. Navistar International Transportation Corp.*, 213 Ill. App. 3d 242, 248-49, 571 N.E.2d 1107, 1111 (1991).

¶ 30        Gary contends he made the necessary showing for the trial court to reopen the evidence—he attributes his failure to submit this new evidence to inadvertence, he maintains the evidence is of the utmost importance to his case because it shows the entire Edward Jones IRA is nonmarital, and he believes Carla will neither be surprised nor unfairly prejudiced if the evidence is reopened. We do not agree with him.

¶ 31        Gary argues his counsel, Carla's counsel, the trial court "inadvertently presumed that the Edward Jones IRA was marital property when it was, in fact, Gary's nonmarital property." This errant presumption, in Gary's view, caused his counsel to "inadvertently exclude" this new evidence because she "thought she had presented sufficient evidence" to establish Gary's nonmarital contribution. Gary, however, provides nothing other than his bald assertion that this failure to introduce the evidence amounts to inadvertence. Simply using the word "inadvertent" or some variation thereof in the appellate briefing does not satisfy Gary's burden here.

¶ 32        Merriam-Webster defines "inadvertence" as "(1): the fact or action of being inadvertent; (2) the result of inattention." Merriam-Webster Online Dictionary,

https://www.merriam-webster.com/dictionary/inadvertence (accessed March 14, 2022). Seeing the first definition is unhelpful, we look further and find another definition for "inadvertent" is "unintentional." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/inadvertent (accessed March 14, 2022). Even Gary's conclusory explanations—his attorney "inadvertently presumed" the Edward Jones IRA was marital property so she "thought she had presented sufficient evidence" for reimbursement—do not qualify as "inadvertence" under Merriam-Webster's definitions because those explanations do not show counsel's failure to submit the evidence was unintentional or resulted from inattention. Based on Gary's argument, his trial counsel calculated (or perhaps miscalculated) that the evidence she submitted satisfied his burden for reimbursement or for showing the nonmarital property retained its identity. Inadvertence is not incompetence. Gary can litigate his prior counsel's competence in another court.

¶ 33    On another note, Gary has not alleged he could not have presented the new evidence at trial. We surmise Gary had an opportunity to present this evidence at trial and did not. Though we do not have the benefit of the transcript detailing the hearing on Gary's and Carla's posttrial motions, the trial court's order supports our conclusion that Gary did not allege, let alone show, he could not have produced this evidence at an earlier time. The trial court's docket entry stated: "The proposed evidence was available to [Gary] at time of trial. Neglecting to present such evidence at the original trial is not reason enough to give [him] a [second] bite at the apple."

¶ 34    We find this case comparable to *In re Marriage of Sawicki*, 346 Ill. App. 3d 1107, 806 N.E.2d 701 (2004). There, the husband moved to reopen the evidence after the trial court entered the judgment of dissolution, which the trial court denied. *Sawicki*, 346 Ill. App. 3d at

1120. Restating the principle that a trial court does not abuse its discretion by denying a motion to reopen proofs when the evidence offered for the first time in a posttrial motion could have been presented at an earlier time, this court affirmed the trial court's decision. *Sawicki*, 346 Ill. App. 3d at 1120 (citing *Davis*, 215 Ill. App. 3d at 776). Upon finding the husband "failed to allege that the evidence he wanted to introduce could not have been produced at an earlier time," we held the trial court did not abuse its discretion by denying the motion. *Sawicki*, 346 Ill. App. 3d at 1120. Likewise, we see no abuse of discretion in the trial court's decision denying Gary's motion to reopen proofs when he did not allege he could not have presented the additional evidence at an earlier time. Indeed, the trial court could have denied the motion to reopen on that basis alone. See *Stringer*, 351 Ill. App. 3d at 1142 ("[I]f evidence offered for the first time in a posttrial motion could have been produced at an earlier time, the court may deny its introduction into evidence on that basis."); see also *Chicago Transparent Products, Inc. v. American National Bank and Trust Co. of Chicago*, 337 Ill. App. 3d 931, 942, 788 N.E.2d 23, 32 (2002) (stating "[i]t is the parties' responsibility to present evidence at trial" in denying a motion to reopen proofs when the party could have produced the evidence at trial).

¶ 35        Since Gary failed to establish inadvertence, we need not consider the remaining three *Stringer* factors. He has not met his burden for reopening the evidence. The trial court's decision here took account of the facts before it and the applicable case law; consequently, it was not arbitrary, fanciful, or unreasonable. See *Lisk*, 2020 IL App (4th) 190364, ¶ 22.

¶ 36                                2. *Motion to Reconsider*

¶ 37        "Motions to reconsider are retrospective in nature." *Stringer*, 351 Ill. App. 3d at 1141. "The purpose of a motion to reconsider is to bring to the trial court's attention (1) newly discovered evidence not available at the time of the hearing, (2) changes in the law, or (3) errors

in the court's previous application of existing law." *Stringer*, 351 Ill. App. 3d at 1140. "When a party seeks reconsideration based on newly discovered evidence," as we have here, "the party must present a reasonable explanation for why the evidence was not available at the time of the original hearing." *Devyn Corp. v. City of Bloomington*, 2015 IL App (4th) 140819, ¶ 65, 38 N.E.3d 1266. A reasonable explanation sufficient for granting the motion to reconsider should include a showing "that the newly discovered evidence existed before the initial hearing but had not yet been discovered or was otherwise unobtainable," despite due diligence from the moving party. *Stringer*, 351 Ill. App. 3d at 1141. "The decision to grant or deny a motion to reconsider lies within the trial court's discretion, and we will not disturb the court's ruling absent an abuse of discretion." *Stringer*, 351 Ill. App. 3d at 1140.

¶ 38           Based upon the trial court's docket entry, it appears Gary sought reconsideration based on newly discovered evidence, yet he produced no reasonable explanation why the evidence was not available at the June 2020 trial but was then available in March and April 2021. The trial court gave the following reasoning for denying Gary's motion to reconsider: "[Gary's] Ex[hibits] 1-24 offered on 4/13/21 are not newly discovered evidence, as contemplated, which would justify a re-opening of the case." Like his motion in the trial court, Gary's appellate brief does not address the newly-discovered-evidence standard, but seeks to relitigate the property division, particularly the Edward Jones IRA. Since Gary makes no effort to provide a reasonable explanation for why his proffered exhibits constitute newly discovered evidence (why they were not discoverable or obtainable at trial), nor does he try to explain why the trial court should have granted the motion to reconsider, we will not strive to divine such arguments. The trial court denied the motion, and based on the facts and argument before us, we do not see that decision as

- 15 -

unreasonable, fanciful, or arbitrary. See *Lisk*, 2020 IL App (4th) 190364, ¶ 22. Consequently, we conclude the trial court did not abuse its discretion in denying Gary's motion to reconsider.

¶ 39                                    B. The Edward Jones IRA

¶ 40        The trial court found Gary commingled three nonmarital retirement accounts into the Edward Jones IRA (a marital asset) during the marriage. It then found those funds transmuted into marital property. Since Gary did not trace the funds by clear and convincing evidence, the court determined Gary was not entitled to reimbursement under section 503(c)(2)(A) of the Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(c)(2)(A) (West 2018)). On appeal, Gary argues the trial court's decision denying him reimbursement for the $454,064 nonmarital contribution he made to the Edward Jones IRA goes against the manifest weight of the evidence. We agree, though we reach our decision by different means.

¶ 41        "[A] trial court's factual findings in a marriage dissolution proceeding—such as whether property is marital or nonmarital or whether reimbursement is appropriate—will not be reversed on appeal unless they are against the manifest weight of the evidence." *In re Marriage of Dhillon*, 2014 IL App (3d) 130653, ¶ 46, 20 N.E.3d 1272; see also *In re Marriage of Berberet*, 2012 IL App (4th) 110749, ¶ 60, 974 N.E.2d 417 (" 'A trial court's property classification will not be disturbed unless it is contrary to the manifest weight of the evidence.' " (quoting *In re Marriage of Henke*, 313 Ill. App. 3d 159, 166, 728 N.E.2d 1137, 1143 (2000))). This includes a determination of whether commingled property lost or retained its identity. *In re Marriage of Samardzija*, 365 Ill. App. 3d 702, 706, 850 N.E.2d 880, 884 (2006). "A court's decision is contrary to the manifest weight of the evidence if the opposite conclusion is clearly evident or if its findings are unreasonable, arbitrary, and not based upon any of the evidence." *Berberet*, 2012 IL App (4th) 110749, ¶ 60.

¶ 42     We begin our analysis where the parties and trial court seemingly began theirs—Gary's Edward Jones IRA, opened during the marriage, amounted to a marital asset comprised of commingled marital and nonmarital funds. Section 503(c) of the Act governs commingled property, providing the following:

>     "(c) Commingled marital and non-marital property shall be treated in the following manner, unless otherwise agreed by the spouses:

>     (1)(A) If marital and non-marital property are commingled by one estate being contributed into the other, the following shall apply:

>     (i) If the contributed property loses its identity, the contributed property transmutes to the estate receiving the property, subject to the provisions of paragraph (2) of this subsection (c).

>     (ii) If the contributed property retains its identity, it does not transmute and remains property of the contributing estate.

>     (B) If marital and non-marital property are commingled into newly acquired property resulting in a loss of identity of the contributing estates, the commingled property shall be deemed transmuted to marital property, subject to the provisions of paragraph (2) of this subsection (c).

(2)(A) When one estate of property makes a

contribution to another estate of property, the contributing

estate shall be reimbursed from the estate receiving the

contribution notwithstanding any transmutation. No such

reimbursement shall be made with respect to a contribution

that is not traceable by clear and convincing evidence or

that was a gift." 750 ILCS 5/503(c) (West 2018).

Under section 503(c), commingling and transmutation are neither synonymous nor even

coextensive terms, meaning trial courts may not equate commingling with transmutation. Indeed,

we have noted there is no "presumption that commingled property always *** transmute[s] to

marital property." *Henke*, 313 Ill. App. 3d at 168. When evaluating commingled property for

purposes of property division, a trial court must first determine whether the contributing estate

lost its identity when it commingled with the receiving estate. If the court finds the contributed

property lost its identity, then the court must find that property transmuted to the receiving estate.

750 ILCS 5/503(c)(1)(A)(i), (B) (West 2018). Transmuted property is subject to reimbursement

under the statute (750 ILCS 5/503(c)(1)(A)(i), (B) (West 2018)), meaning the estate contributing

property to the receiving estate may be reimbursed for that contribution. 750 ILCS

5/503(c)(2)(A) (West 2018). By contrast, if the court finds the contributed property retained its

identity, then no transmutation occurs and the contributed property remains property of the

contributing estate, which ends the analysis and renders a reimbursement analysis

unecessary.750 ILCS 5/503(c)(1)(A)(ii) (West 2018). For example, if nonmarital property is

commingled with marital property yet retains its identity, then it remains nonmarital property and

should be classified and divided accordingly. The party contributing the nonmarital property

under these circumstances does not need to trace the property for reimbursement purposes under section 503(c)(2)(A).

¶ 43    The trial court's order conflates and confuses this analysis, particularly the classification, transmutation, and reimbursement analyses. After quoting from section 503(c)(2)(A) on the standard for reimbursement, the trial court then concluded, "The burden then is on [Gary] to show these funds have not been transmuted." As we outlined above, the transmutation determination must be made after classification but before proceeding to a reimbursement analysis. Nevertheless, the trial court made the following findings about Gary's three nonmarital retirement accounts:

> "There is no doubt that [Gary] possessed three accounts prior to the marriage which totaled $454,064. Respondent's exhibit D clearly demonstrates that. [Gary] also testified that these funds were closed sometime after the marriage and transferred to the Edward Jones Account. This testimony was uncontroverted at trial."

The trial court, however, found it "[could] not conclude that the commingled funds maintained their identity." Noting Carla's argument that Gary did not provide evidence showing the value of the three accounts on the dates of transfer, the trial court found, "[t]here [was] insufficient evidence detailing the *exact* amount transferred that can be appropriately traced." (Emphasis added.) With this finding, the trial court essentially compressed the classification, transmutation, and reimbursement findings into one. Even with our deferential standard of review, we cannot affirm the trial court's conclusion there was insufficient evidence that Gary's nonmarital contribution to the Edward Jones IRA—the $454,064 in three retirement accounts as of

- 19 -

December 31, 2006—retained its identity as nonmarital property. To the contrary, the evidence showed Gary's nonmarital property (investments) remained investments once he began commingling them with nonmarital property (contributions and appreciation).

¶ 44    With *In re Marriage of Werries*, 247 Ill. App. 3d 639, 642, 616 N.E.2d 1379, 1383-84 (1993), this court explained a party's nonmarital money often loses its identity when it is used to purchase marital property. We gave the example that if "H uses his personal savings account to buy the family station wagon after the kids are born," then "the cash loses its identity as a nonmarital asset." *Werries*, 247 Ill. App. 3d at 642. This would be transmutation under section 503(c)(1)(A)(i). We also explained another way a party's nonmarital money could be transmuted. In this example "H and W each sell nonmarital homes to buy a new home," making the new home marital property. *Werries*, 247 Ill. App. 3d at 642. This would be transmutation under section 503(c)(1)(B). Here, by contrast, Gary's property never changed nor lost its identity; he rolled money from three separate retirement accounts into one new account. Money remained money. Once he clearly identified his nonmarital portion ($454,064) and conceded anything more than that is marital property, the nonmarital property retained its identity. Any suggestion from Carla's closing statement that Gary transferred less than $454,064 into the Edward Jones IRA is not supported by the evidence.

¶ 45    Gary clearly and convincingly identified his nonmarital property ($454,064) at the time of the marriage—the trial court found as much. The trial court's order found "[t]here [was] *no doubt* that [Gary] possessed three accounts prior to the marriage which totaled $454,064," and "Respondent's exhibit D *clearly* demonstrates that." (Emphases added.) Besides finding clear evidence identified the nonmarital funds, having "no doubt" signals the trial court was convinced by that evidence. The court went on to find that Gary's testimony that he closed the accounts

during marriage and transferred those funds (two of which at least doubled, if not tripled, since December 2006) into the Edward Jones IRA "was *uncontroverted at trial*." (Emphasis added.) Notably, the trial court made no express credibility finding as to Gary's testimony, although the above factual findings indicate the trial court found Gary's testimony believable. The language the trial court used in making factual findings does not correlate to its legal conclusion that Gary's nonmarital property did not maintain its identity during commingling, especially given *Werries*'s guidance on when money loses its identity.

¶ 46 There was no evidence suggesting Gary had less in those accounts at the time of transfer. Gary testified (and Respondent's exhibit D confirmed) he had $344,090.23 in the Wachovia account in December 2006, and then he confirmed "that money was then transferred into the IRA" in 2011. Gary testified (and Respondent's exhibit D confirmed) his AHRP 403(b) totaled $69,180.84 and his AHRP 401(a) totaled $40,792 in December 2006, but he then estimated those accounts totaled between $150,000 and $200,000 each when he transferred them in March 2016. His handwritten notation on page 12 of Respondent's exhibit D, which was admitted for demonstrative purposes, indicated he transferred $250,000 from the AHRPs into the Edward Jones IRA. Although Gary acknowledged he borrowed $50,000 from AHRP 403(b) for the down payment on the marital residence in 2011, he also testified he repaid the loan before transferring the account to the Edward Jones IRA in March 2016. Even so, the down payment on the marital home amounted to a marital expense that both parties benefitted from for the remainder of the marriage. See *In re Marriage of Snow*, 277 Ill. App. 3d 642, 650, 660 N.E.2d 1347, 1352 (1996) (noting martial estate need not be reimbursed when it has already been compensated by use of the property).

¶ 47        Despite Gary's "clear" evidence identifying his nonmarital property, which left

the trial court with "no doubt" the property existed, and his "uncontroverted" testimony he

transferred all of those funds into the Edward Jones IRA, the trial court found the money could

not "be appropriately traced" because Gary did not provide documentation of the transfers,

particularly the exact values on the date of transfer. This finding does not align with the

uncontroverted evidence.

¶ 48        Carla's written closing argument tried to inject doubt as to what amount was

actually transferred into the Edward Jones IRA, yet she had made no claims Gary dissipated

assets. Carla's (and by extension the trial court's) concern that Gary failed to prove the exact

account values on the date of transfer are negated by Gary's concession that any appreciation in

the accounts was marital from the date of the marriage forward. Gary forewent any claims or

argument that appreciation on the accounts remained his nonmarital property. See 750 ILCS

5/503(a)(7) (West 2018) (classifying as "non-marital property" "the increase in value of

non-marital property, irrespective of whether the increase results from a contribution of marital

property, non-marital property, the personal effort of a spouse, or otherwise, subject to the right

of reimbursement"); *In re Marriage of Steinberg*, 299 Ill. App. 3d 603, 610, 701 N.E.2d 254, 258

(1998) (stating the Act "specifically provides that the increase in the value of nonmarital

property is also nonmarital property," subject to reimbursement). He conceded anything added to

the accounts between December 2006 and 2011 and March 2016 when he transferred them into

the Edward Jones IRA was a marital contribution.

¶ 49        The trial court's decision finding "it cannot conclude that the [commingled] funds

maintained their identity" stands against the manifest weight of the evidence. Given the clear

evidence and uncontroverted testimony, which left the trial court with no doubt as to Gary's

nonmarital retirement accounts, the opposite conclusion is clearly evident. See *Berberet*, 2012 IL App (4th) 110749, ¶ 60. Gary's nonmarital retirement accounts retained their identity as they were rolled into the newly created Edward Jones IRA, especially since he conceded any additions or appreciation to that amount were marital property subject to a 50-50 split. More importantly, the practical effect of Gary's concession that all amounts after the marriage were marital removes the need to ascertain the extent of commingling at the dates of transfer since he conceded everything above his clearly identifiable nonmarital contribution was marital. Upon finding the nonmarital property retained its identity, it should have been classified as such and assigned to Gary in the property division. 750 ILCS 5/503(c)(1)(A)(ii) (West 2018).

¶ 50　　　　　In our view, there was no need to do a reimbursement analysis outlined in section 503(c)(2)(A) because Gary's commingled nonmarital property did not transmute into marital property, but even so, we find the trial court erroneously decided Gary was not entitled to reimbursement under the statute. By proving he held $454,064 in three retirement accounts at the time of the marriage and testifying he transferred that money into the Edward Jones IRA, Gary traced his nonmartial property by clear and convincing evidence. For this issue, we rely on the Third District's decision in *Dhillon*.

¶ 51　　　　　In *Dhillon*, the husband argued "the trial court erred in finding that his entire 401(k) account was marital property, including a portion that had been accumulated prior to the marriage." *Dhillon*, 2014 IL App (3d) 130653, ¶ 44. He asserted he was entitled to reimbursement "for the contributions that were made to the 401(k) account *prior to the marriage*." (Emphasis added.) *Dhillon*, 2014 IL App (3d) 130653, ¶ 44. The husband held retirement accounts prior to the marriage in 2002 and, once married, he continued contributing to his Mahle 401(k) account. When he left Mahle for Caterpillar in 2005, he rolled over his Mahle

401(k) into his new 401(k). In the dissolution proceedings, the husband testified to the retirement accounts, he presented an account statement for the Mahle 401(k) from six months before the marriage showing a balance of $3170.97, and he submitted "another statement showing the total amount of the rollover[ ] a few years after the marriage." *Dhillon*, 2014 IL App (3d) 130653, ¶ 47. The trial court, however, found the "husband's nonmarital estate was not entitled to reimbursement for contributions that were made to husband's 401(k) account prior to the marriage because those funds had lost their identity and had become entirely marital property when they were rolled into the marital retirement account at Caterpillar." *Dhillon*, 2014 IL App (3d) 130653, ¶ 15. The husband appealed, and the appellate court reversed on this point, holding, "[t]he trial court *** erred when it determined that the entire Caterpillar 401(k) was marital property and that husband's nonmarital estate was not entitled to reimbursement." *Dhillon*, 2014 IL App (3d) 130653, ¶ 47.

¶ 52        Gary invokes *Dhillon* to support his argument that he was entitled to reimbursement for his nonmarital contribution to a marital retirement account. Carla, meanwhile, distinguishes *Dhillon*, noting how there, unlike here, the husband submitted a document "showing the total amount of the rollover, a few years after the marriage." *Dhillon*, 2014 IL App (3d) 130653, ¶ 47. Carla's point is well taken, but her distinguishing point does not diminish *Dhillon*'s rationale or its sway here. Though the husband in *Dhillon* submitted the extra document showing the rollover amount, that did not factor into the appellate court's analysis or decision. The Third District reversed, even though the trial court had found the husband's testimony not credible, because "the documentary evidence established the *exact amount that husband had contributed to his 401(k) account shortly before the marriage*." (Emphasis added.) *Dhillon*, 2014 IL App (3d) 130653, ¶ 47. The appellate court's emphasis on the amount of

nonmarital property at the time of the marriage and not at the time of the rollover is evidenced by its decision to "remand for the trial court to order a credit of $3,170.97 to husband's nonmarital estate (the nonmarital portion of husband's 401(k) account)." *Dhillon*, 2014 IL App (3d) 130653, ¶ 47. The Third District did not trace the appreciation of the nonmarital portion, nor did it trace the marital contributions, though it could have with the additional documentation the husband provided. The Third District appellate court determined the husband was entitled to a credit for the amount proved to have been in his nonmarital property *at the time of the marriage*, which is what had he requested.

¶ 53        Notably, the *Dhillon* "trial court found that *** *husband had no credibility*, (emphasis added) (*Dhillon*, 2014 IL App (3d) 130653, ¶ 15), and even with the deferential standard of review the appellate court still reversed because the husband clearly identified his nonmarital property prior to the marriage. The trial court here, by contrast, did not specifically express a credibility determination as to Gary's testimony he transferred the Wachovia and AHRPs into the Edward Jones IRA, but it did label it "uncontroverted." If evidence is not disputed and noted as such in the trial court's order, we surmise it was credible. And as we outlined *supra*, Gary testified he rolled over the Wachovia account into the Edward Jones IRA in 2011 and in March 2016 rolled over the two AHRP accounts (with estimated values between $150,000 and $200,000 each). That is (and was) undisputed. Because Gary clearly identified his nonmarital retirement accounts (totaling $454,064) and testified he transferred them into the Edward Jones IRA and only the Edward Jones IRA, he sufficiently traced the funds in accordance with section 503(c)(2)(A). The trial court's contrary finding stands against the manifest weight of the evidence.

¶ 54                    C. Maintenance and Attorney Fees

¶ 55        Carla cross-appealed, arguing the trial court abused its discretion in denying her requests for maintenance and contribution toward her attorney fees. In her briefing, she maintained:

> "If this Court grants any of the requests contained in [Gary's] appeal than [*sic*] it will be necessary for this Court or the trial court to reconsider the rulings denying Carla maintenance and a contribution to attorney fees as each of those rulings was premised on Carla receiving $623,329.18 from the division of the equity in the marital residence, value of the vehicles, and division of retirement accounts including the payment from the Edward Jones IRA."

Although we express no opinion on the trial court's original decision to deny Carla's request for maintenance and attorney fees, we agree with her that the trial court will need to reconsider these claims based on the new property division. The Act outlines the necessary considerations for maintenance and attorney fees determinations, including the property division in the underlying dissolution action. Section 504(a) governs maintenance awards, and the first factor listed for the trial court's consideration is "the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage." 750 ILCS 5/504(a)(1) (West 2018). Concerning contribution to attorney fees, section 503(j)(2) likewise provides, "[a]ny award of contribution to one party from the other party shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." 750 ILCS 5/503(j)(2)

- 26 -

(West 2018). See also *In re Marriage of Nesbitt*, 377 Ill. App. 3d 649, 658, 879 N.E.2d 445, 452 (2007) ("To determine a reasonable contribution award, the trial court must consider the marital property criteria under section 503 and, if maintenance is awarded, the maintenance criteria under section 504."). Since the Act requires the trial court to consider the property division in these decisions and this order alters that division, we remand this matter to the trial court for further evaluation of Carla's request for maintenance and contribution in light of the new property division.

¶ 56                                    III. CONCLUSION

¶ 57        For the reasons stated, we affirm in part, reverse in part, and remand the matter for further proceedings consistent with this order.

¶ 58        Affirmed in part and reversed in part; cause remanded.